**THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| Randall Gregg, et. al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 04-425C |
| | ) | (Judge Lettow) |
| The United States, | ) | |
| Defendant. | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT**

**COUNT I**
**JURISDICTION**

1. The claims herein are founded on contracts, express or implied-in-fact, with the Government of the United States. This Court has jurisdiction over the claims herein pursuant to the Tucker Act, 28 U.S.C. § 1491.

2. Alternatively, jurisdiction lies in this Court pursuant to the Contract Disputes Act, 41 U.S.C. § 601 et. seq., including the direct access provision, § 609.

3. This action is timely filed, pursuant to the Tucker Act and the Contract Disputes Act.

## PARTIES

4. The plaintiffs, all United States citizens, are commercial fishermen who at all relevant times held valid state-issued licenses for the harvesting of Tanner crab using pot gear in Southeast Alaska.

5. The United States appears in this action represented by the Department of the Interior (hereinafter "the DOI") and its executive agency the National Park Service (hereinafter "the NPS").

## FACTUAL BACKGROUND

6. The marine waters of Glacier Bay, Alaska are the site of a commercial crab fishery which has been of vital importance in the local economy for the past century.

7. In 1980, Congress designated Glacier Bay a National Park.

8. In 1991, the NPS proposed regulations to phase out and restrict commercial crab fishing and other commercial fishing in Glacier Bay National Park. Recognizing the enormous impact which any reduction on commercial fishing would have on the regional economy, the NPS entered into discussions and negotiations with various representatives of the State of Alaska, commercial fishing interests, and members of the potentially affected communities.

9. On October 21, 1998, the Omnibus Consolidated and Emergency Supplemental Appropriations Act for FY 1999 (Public Law 105-277, 112 Stat. 2681) (hereinafter "the Act") was signed into law.

10. Section 123 of the Act provides specific statutory requirements for the phase-out and restriction of commercial fishing in the marine waters of Glacier Bay.

11. Section 123 of the Act directs the NPS to cooperate with the State of Alaska in developing a management plan for the regulation of commercial fisheries in Glacier Bay proper.

12. In March 1999, the Alaska Department of Fish and Game (hereinafter the "ADF&G") estimated that the Act would cause economic losses to affected parties between $16 million and $23 million.

13. On May 1, 1999, Congress amended Section 123, enacting Section 501 of the 1999 Emergency Supplemental Appropriations Act (Public Law 106-31), which appropriated $23 million for a program to compensate those who were negatively affected by the commercial fishing closures and restrictions.

14. The stated purpose of Section 501 is to fairly compensate United States fish processors, fishing vessel crew members, communities, and others negatively affected by closures and restrictions on commercial fishing in Glacier Bay.

15. In October, 1999, the NPS published a Final Rule that states that the NPS will administer, in a "fair and timely manner," the $23 million compensation program provided by the Act.

16. In November, 1999, the NPS contracted with the McDowell Group, Inc., a Juneau, Alaska research and consulting firm, to assess the economic impact of the fishing restrictions on individuals, businesses, and communities.

17. From January through June of 2000, numerous public forums were held, at which the NPS received both verbal and written public comments on the proposed compensation program and how it might be distributed.

18. During this public comment period, the NPS was addressed by fishermen, crew members, fish processors, community members, community leaders, Native Alaskan leaders, and others.

19. From these individuals and groups, the NPS heard testimony regarding personal business losses, local concerns regarding fishing rights and opportunities, the social, economic and ecological impact of the expected displacement of fishermen, the effect on the fished species, and the impact that this proposed compensation program would or could have as precedent for other fishery closures.

20. At certain of these public hearings, the NPS was advised that the commercial Tanner crab fishery was comprised of those fishermen who held permanent lifetime fishing permits, and those who held temporary, or interim permits, and that holders of both kinds of permits stood to suffer loss of livelihood from the proposed restrictions and closures of Tanner crab fishing in the Bay.

21. At various times during these hearings, testimony was offered questioning the economic and environmental soundness of compensating the retirement of interim permits.

22. Specifically, the NPS was told that paying interim permit holders to retire their permits early would fail completely to serve the goal of the legislation, that is, to reduce the fishery and fairly compensate those persons affected by the reduction, because the interim permits would retire under their own terms, usually within a few years.

23. At one or more of these hearings, Tomie Patrick Lee, the Superintendent of the Glacier Bay National Park and an agent of the United States, made certain representations acknowledging the NPS' awareness that the retirement of interim permits would neither fairly compensate the affected fishermen, nor serve the goals of the legislation.

24. Notwithstanding this awareness and her representations to the contrary, Ms. Lee made promises during the hearings that at least some interim permit holders would be receiving compensation.

25. In August, 2000, the McDowell Group released its final Economic Assessment.

26. The Economic Assessment identified the principal economic losses which would be incurred as a result of restrictions on commercial fishing, and provided an assessment of the potential scope and effects of fishing restrictions in Glacier Bay, including the eventual phase-out of Tanner crab fishing.

27. The stated purpose of the plan was to compensate permit holders in a manner that was proportional to past earnings from Glacier Bay.

28. Ms. Lee stated that any compensation scheme which the NPS would adopt would be "fair" and would "fairly compensate" potentially affected commercial Tanner crab pot fishermen for their expected losses.

29. The defendant finalized and adopted the Glacier Bay Compensation Plan (the "Plan"). An abbreviated Plan was attached to the original complaint as Exhibit A.

30. The Plan proposed reduction of the number of active permits in the Tanner crab pot fishery in Southeast Alaska.

31. The Plan called for the reduction of the number of active Tanner crab pot permits by means of a sealed low bid process.

32. Under the terms of the Plan, both interim and permanent permits qualified for the bidding process.

33. The sum of $847,000 was allocated for compensation to the Tanner crab pot fishermen, under this bidding process of the Plan.

34. The Plan was finalized by the defendants with a full and complete understanding that a significant number of the bids it would receive would be from interim permit holders.

35. The defendant finalized and adopted the Plan knowing that the distribution of the money to the Tanner crab pot permit holders would not have any long term impact on the fishery.

36. The Plan states that a maximum number of ten permits will be retired, and a minimum of seven permits must be retired.

37. The Plan provided further, that any funds leftover from this permit reduction would be distributed equally among qualifying Southeast Tanner pot permit holders.

38. The Plan provided further that in the event that the government could not secure at least seven qualifying bids, it would distribute the $847,000 equally among all qualifying Tanner pot permit holders.

39. Other than the failure of the bidding process to identify at least seven qualifying bids, there was no indication on the part of the defendant at any time that the distribution to the low bidders would be abandoned in favor of an across the board distribution to all permit holders, regardless of whether they were part of the bidding process.

40. The NPS solicited bids for the permit reduction program, pursuant to the terms of the Plan.

41. Tomie Patrick Lee, acting as a representative of the United States, had the actual and express authority to make the final determination on each application and to bind the government in a contractual obligation to pay out on the accepted bids.

42. In response to the government's solicitation of bids, the plaintiffs each submitted a bid, based on the value of his permit. In every case, the bids were accompanied by the required affidavit, proving the legitimacy of the bid.

43. The bids submitted were as follows:

| | |
|---|---|
| Randall Gregg: | $ 64,890.00 |
| Robert Haltiner: | 78,000.00 |
| John E. Jensen: | 77,776.57 |
| Terrence Larson: | 64,450.00 |
| Peter Roddy: | 34,884.50 |
| Daniel Vick: | 74,898.00 |
| James Perry: | 79,800.00 |

44. By individual correspondence dated April 5, 2002, addressed to each of the named plaintiffs, Tomie Patrick Lee, acting within her authority, accepted the offers of the plaintiffs on behalf of the United States.

45. Each letter referred to in the preceding paragraph stated: "I am in receipt of your bid for permit reduction for your Tanner Crab Pot Permit . . . under the Glacier Bay Compensation Plan. Your bid, for [amount shown] has been reviewed and accepted." This letter was attached to the original complaint as Exhibit B.

46. Other commercial fishermen not plaintiffs here had their bids accepted and some fishermen who did not submit low enough bids had their bids rejected. A list of bids accepted and "Rejected Bids" by the NPS under the Tanner Crab Permit Reduction portion of the Plan was attached to the original complaint as Exhibit

C. This list of successful and unsuccessful bidders was published on a Glacier Bay Compensation Plan web site maintain by the NPS.

47. The letter cited in Paragraph 45 above further directed each plaintiff to provide certain documentation which would allow the government to issue the promised checks. The plaintiffs complied with these requirements.

48. The defendant failed to perform. Weeks, then months, passed, and no checks were issued.

49. The plaintiffs were placed in economic peril by the defendant's failure to perform.

50. By correspondence dated October 8, 2002, plaintiff Daniel Vick requested an explanation from the defendant for its failure to perform, and advised the defendant that the delay in payment was harming him and other fishermen because they neither had the money the defendant had promised them, nor were they were free to fish their permits in the upcoming season, since they had promised to relinquish them, and they stood ready to perform.

51. By correspondence dated October 28, 2002, signed by Robert L. Arnberger, the Regional Director of the NPS and an agent of the defendant, the NPS replied that the fishermen could fish their permits if they wanted to. This letter did not respond to the inquiry about the whereabouts of the promised payment, or give any hint that the defendant United States had no intention of honoring its promise to pay on the accepted bids.

52. In fact, one week earlier, Mr. Arnberger had signed a "Record of Decision" that announced that the government would not be honoring the promise to pay on the accepted bids.

53. The Record of Decision was not sent to any of the plaintiffs nor was its substance made known to them until approximately March 17, 2003, six months after it was written, and almost one year after the plaintiffs' bids were accepted.

54. The Record of Decision acknowledged the defendant's receipt of ten qualifying low bids.

55. Despite this, the Record of Decision concluded that the permit reduction bid process had not been successful.

56. Instead of honoring the promise made by the NPS Superintendent Tomie Patrick Lee to pay the agreed-upon compensation to the accepted low bidders and dividing the remainder of the $847,000 to the balance of the permit holders as set forth in the Plan, the Record of Decision announced that the government would be distributing the $847,000 equally to all permit holders.

57. Subsequently, all the Tanner crab permit holders including the plaintiffs were each paid $11,000 by virtue of owning a Southeast Alaska Tanner crab pot permit.

58. The plaintiffs brought their claims arising out of their contracts with the government to the government's contracting officer.

59. By correspondence dated November 24, 2003, to plaintiffs' counsel, the contracting officer, Joy C. Kucinski, denied the applicability of the CDA and denied the plaintiff's contract claims altogether.

## SUBSTANTIVE ALLEGATIONS

## COUNT II
***Breach of Express Contract***

60. Both the plaintiffs and the United States, through its executive agencies and representatives, intended to enter into a binding contract whereby the plaintiffs would relinquish their Tanner crab pot permits in exchange for an agreed-upon amount of compensation to be paid by the government.

61. The government's offer is set forth in the Glacier Bay Compensation Plan.

62. The plaintiffs' acceptance is memorialized in their affidavits and applications submitted as part of the bidding process.

63. The letter dated April 5, 2002, signed by Tomie Patrick Lee evidenced the defendant's acceptance of the plaintiffs' offers and constituted a binding, express contract.

64. The contract described herein constitutes an executive agency contract, within the meaning of 41 U.S.C. § 602(a).

65. Each plaintiff stood ready to relinquish his Tanner crab pot permit, upon performance by the defendant.

66. There was thus mutuality of assent, an offer, acceptance, and consideration.

67. Tomie Patrick Lee had the actual authority to bind the government in contracts with the plaintiffs, as herein alleged.

68. The defendant breached its contract with the plaintiffs by refusing to perform its obligation of paying the amount of the accepted bids.

69. As a result of the defendant's breach, the plaintiffs each incurred damages.

WHEREFORE, the plaintiffs demand judgment against the defendant and compensation in the amount of the accepted bids, plus interest, costs, and such other relief as this Court may deem appropriate.

## COUNT III
### ***Breach of Implied- in-Fact Contract***

70. The plaintiffs repeat and reallege each of the allegations set forth in Counts I and II, as if set forth in full herein.

71. A contract-in-fact was created between the defendant and each of the plaintiffs, by various representations made by the parties, and by the circumstances in which these representations were made.

72. Specifically, the government solicited bids from Tanner crab pot fishermen, for the purpose of selecting between seven and ten permits which would be retired.

73. In exchange for the retirement of the permits, the defendant agreed to pay a sum certain in compensation.

74. This sum was agreed upon by the parties in verbal conversations, and was memorialized on April 5, 2002, in correspondence from Tomie Patrick Lee addressed to each of the plaintiffs.

75. Tomie Patrick Lee had the actual and express authority to enter into contracts on the part of and in such a way as to bind the government.

76. By her words both written and spoken, the NPS Superintendent Tomie Patrick Lee bound the government in an implied-in-fact contract with the plaintiffs.

77. There was thus mutuality of assent, an offer, acceptance, consideration, and authority on the part of the person representing the Government.

78. The Government refused to pay the agreed-upon sum and thus breached the implied-in-fact contract.

79. As a result, the plaintiffs suffered damages.

WHEREFORE, plaintiffs demand judgment against the defendant and compensation in the amount of the accepted bid, plus interest, costs, and any other relief which this Court deems just and appropriate.

**COUNT IV**
***Misrepresentation in the Inducement***

80. The plaintiffs repeat and reallege each of the allegations set forth in Counts I, II, and III as if set forth in full herein.

81. On information and belief, at the time the defendant United States distributed the Glacier Bay Compensation Plan, it knew that the retirement of interim permits would fail to satisfy the goals of the legislation as well as the stated goals of the Plan itself.

82. On information and belief, the government also knew that the Plan was widely criticized within the communities it was supposed to serve, for its failure to address the inequity of the planned distribution to a small group of low bidders.

83. On information and belief, the defendant was told that the bidding process would never work, and it was urged not to adopt it and to, generate more appropriate funds to compensate the wider group of fishermen for their real losses.

84. Knowing that inclusion of interim permits in the bidding process would result in a compensation scheme that would not serve the goals of the legislation or the larger body of fishermen, the government solicited bids, went through the motions of a bidding process, and agreed to pay out on the winning bids.

85. At some point before the completion of the bidding process, the defendant formed the intent not to pay out on the winning bids.

86. Nevertheless, it continued to make erroneous representations about the efficacy and viability of the Compensation Plan, specifically that the ten low bidders would be awarded compensation based on their past earnings, as reflected in their bids.

87. The defendant knowingly used these and other false statements to induce the plaintiffs to enter into the subject contracts.

88. The representations as herein alleged were material to the plaintiffs who expended time and resources in reliance thereon.

89. The representations as herein alleged in fact induced the plaintiffs to enter into contracts with the defendant, to submit bids, and to hold in abeyance their permits.

90. The plaintiffs had a legal right to rely on the representations as herein alleged.

91. The plaintiffs did in fact so rely, to their detriment.

92. As a result, the plaintiffs suffered damages.

WHEREFORE, plaintiffs demand judgment against the defendant and compensation in the amount of each individual plaintiff's permit bid, plus interest, costs, attorney's fees, and any other relief which this Court deems just and appropriate.

**COUNT V**
***Tortious Breach of Contract***

93. The plaintiffs repeat and reallege each of the allegations set forth in Counts I, II, III, and IV as if set forth in full herein.

94. The parties hereto had certain duties to each other, arising out of their privity of contract.

95. In violation of those duties, the defendant formed the intent to repudiate the contract with the plaintiffs months if not close to one year before it informed the plaintiffs of its intention.

96. The defendant knew the contracts would be relied upon by the plaintiffs to their detriment, and yet the defendant knowingly and intentionally refused to inform them that the contracts would not be honored, until after the plaintiffs suffered considerable harm.

97. The defendant had no commercially justifiable excuse for repudiating the contracts, or for withholding the fact of its repudiation from the plaintiffs.

98. The plaintiffs are not at fault and could not have foreseen the defendant's repudiation of the contracts, or for the defendant's withholding the fact of its repudiation from the plaintiffs.

99. As a result of the unjustifiable repudiation and breach by the defendant, the plaintiffs suffered damages.

WHEREFORE, plaintiffs demand judgment against the defendant and compensation in the amount of the amount of each plaintiff's bid, plus interest, costs, attorney's fees any other relief which this Court deems just.

**COUNT VI**
***Bad Faith***

100. The plaintiffs repeat and reallege each of the allegations set forth in Counts I, II, III, IV, and V as if set forth in full herein.

101. At all times relevant hereto, the defendant and its agents had a duty of good faith and fair dealing, which it owed to the plaintiffs.

102. The defendant breached this duty in numerous ways.

103. Specifically but not by way of limitation,

1) The defendant promised to fairly and adequately compensate the plaintiffs for their expected losses based on past earnings and yet it devised a compensation scheme that it knew, based on its specialized knowledge, would never come close to achieving that goal.

2) In doing so, the defendant ignored the professional advice it had solicited and paid for with the citizens' money.

3) The defendant knew before the bidding process began that any plan to retire interim permits would not serve the purpose of the legislation, nor would it fairly and adequately compensate those persons affected by the regulations of the fishery, and yet it solicited bids from interim permit holders and promised to pay the lion's share of the appropriated compensation money to them.

4) The defendant formed the intent to repudiate the contracts with the plaintiffs eleven months and two weeks before it informed any of the plaintiffs of its intent, knowing that during that time the plaintiffs would suffer economic losses in reliance on the defendant's promise to pay on the accepted bids.

104. The Glacier Bay Compensation Plan was so badly conceived and negligently and intentionally mismanaged as to evidence bad faith.

105. The plaintiffs had a right to rely on the good faith of and to expect fair dealing from the defendant.

106. The defendant's actions both in soliciting the plaintiffs' participation in a bidding scheme that it knew would never work, in repudiating its obligations under the contracts it entered into with the plaintiffs, and in keeping the fact of its intention to repudiate a secret from the plaintiffs knowing and expecting that they would suffer damages, constitutes bad faith.

107. As a result, the plaintiffs suffered damages.

WHEREFORE, plaintiffs demand judgment against the defendant and compensation in the amount of each plaintiff's permit bid (a total of $474,699.07), plus interest, costs, attorney's fees, and any other relief that this Court deems just and appropriate.

Dated this ____ day of September, 2004.

**LAW OFFICE OF BRUCE B. WEYHRAUCH, LLC.**

______________________________

Bruce B. Weyhrauch, Of Attorneys for Plaintiffs
Alaska Bar Number 8706057

**Certificate of Service**

The undersigned certifies that a copy of the foregoing was mailed and faxed to the following on September ____, 2004.

Ms. Carolyn J. Craig, Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington D.C. 20530
(202) 305-7644

______________________.
Bruce B. Weyhrauch